# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Linda J. Eilen,

       Plaintiff,

v.

Minneapolis Public Schools, a/k/a
Special School District #1; and
Kristiana Ward, individually and in her
official capacity,

       Defendants.

File No. 17-cv-04388 (ECT/DTS)

**MEMORANDUM OPINION
AND ORDER**

Philip G. Villaume and Jeffrey D. Schiek, Villaume & Schiek, P.A., Bloomington, MN,
for plaintiff Linda J. Eilen.

Margaret A. Skelton and Timothy S. Christensen, Ratwick, Roszak & Maloney, P.A.,
Minneapolis, MN, for defendants Minneapolis Public Schools and Kristiana Ward.

Plaintiff Linda J. Eilen teaches in the Minneapolis Public Schools. In this lawsuit, she alleges that Defendants took several adverse employment actions against her during a single school year and that these adverse actions violated the Family and Medical Leave Act ("FMLA"), Minnesota's Whistleblower Act, and 42 U.S.C. § 1983. Following nine months or so of discovery, Defendants seek summary judgment on all of Eilen's claims. Their motion will be granted because Eilen has not identified facts to support essential elements of each of her claims.

Eilen's claims arise entirely from the 2015–2016 school year when Eilen taught, and defendant Kristiana Ward served as principal, at Bryn Mawr Elementary School. *See* Compl. ¶¶ 5–43 [ECF No. 1-1]. Understanding Eilen's claims requires describing in some detail a series of personal events and work-related meetings and incidents that occurred during that academic year, but it helps to start with a few more general background facts. Eilen has worked as a teacher for the Minneapolis Public Schools ("MPS") since the early 1980s, and she began teaching first grade at Bryan Mawr in 2012. *See* Skelton Aff. Ex. 2 ("Eilen Dep.") at 14, 19, 34 [ECF No. 22-2]. Ward served as Bryn Mawr's principal beginning in 2015. Skelton Aff. Ex. 1 ("Ward Dep.") at 9–10 [ECF No. 22-1]. By the time Ward arrived, Eilen already had established a reputation within the school as a strong teacher, and Eilen began serving as the Bryn Mawr building steward for the teachers' union during the 2015–2016 academic year. *Id.* at 12–13; *see also* Mem. in Opp'n at 2–4 [ECF No. 24] (collecting colleague observations).

A

Eilen and members of her family experienced a series of health challenges in September 2015 that resulted in Eilen's absence from work. Eilen was absent from work one day in early September for her daughter's surgery, and she also was out on September 17 and 18—a Thursday and Friday—for her son's surgery. Eilen Dep. at 58.

---

[1] In describing the relevant facts and resolving this motion under Rule 56(a), all of Eilen's evidence is believed, and all justifiable inferences are drawn in her favor. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

The following day, Saturday, September 19, Eilen herself was admitted to an emergency room with a medical issue, *id.* at 59, and she was unable to return to work for over a week, until Tuesday, September 29, *see* Skelton Aff. Ex. 4 at 1–2 [ECF No. 22-4]. Principal Ward stayed in contact with Eilen during this time. The day before her son's surgery, Ward emailed Eilen about at least one complaint that Ward had received from parents, Eilen Dep. at 57, and during Eilen's hospitalization and subsequent recovery, Ward called and emailed Eilen about her job duties and conveyed similar verbal communications through Eilen's fiancé, *id.* at 62; Villaume Aff. Ex. N [ECF No. 25-14]. Eilen did not seek FMLA leave at that time. Eilen Dep. at 88–89.

Eilen returned to work on Tuesday, September 29, and Ward and Eilen met the next day to discuss a number of concerns parents had voiced about Eilen's classroom relating to communication with families and assignments given to students. Skelton Aff. Ex. 5 [ECF No. 22-5]; Ward Dep. at 31–33. Ward testified that her intention for that meeting with Eilen was to communicate the parents' complaints to Eilen and to come up with a plan for responding. Ward Dep. at 33–34. Ward observed during her deposition that "when parents make a complaint, there's always multiple sides to the story. So it's really good for teachers to be aware of what those complaints are so that I can either support or help develop a plan or kind of help support the teacher and the parent." *Id.* at 33–34. Eilen worked the remainder of that week but was out again several days at the beginning of the next week with further medical issues. Skelton Aff. Ex. 4 at 2.

Ward continued to receive complaints from parents of Eilen's students, and the two had a "due-process meeting" on October 9.[2] Ward Dep. at 35–36. In particular, parents had expressed concerns about a lack of communication from Eilen and the lack of a consistent teacher presence while multiple substitute teachers cycled through Eilen's classroom during her absence. *Id.* Eilen shared with Ward certain medical documentation relating to her own recent absences and ongoing medication needs, as well as documentation of her children's surgeries, and the two discussed the impact of her medical absences on her students' learning. Eilen Dep. at 81–82. The two also discussed that Eilen's medical absences had caused her to miss a training that was required before she could use a newly acquired phonics curriculum; in the interim, Eilen had been using other research-based phonics programs. *Id.* at 60–62. (Ultimately, Eilen never completed the training because MPS stopped using the curriculum shortly thereafter due to concerns that it was culturally insensitive. *Id.* at 61.)

Two events relevant to Eilen's claims occurred following the October 9 meeting. First, Eilen applied, and was approved, for intermittent FMLA leave dating back to September 18. *Id.* at 89. Second, a letter was sent to the parents of Eilen's students on

---

[2]      The term "due-process meeting" emanates from *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). In that case, the Supreme Court held that the Due Process Clause of the U.S. Constitution entitles a tenured public employee to notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story before her employment may be terminated. *Id.* at 546–48. Here, the Parties use the terms "due-process meeting" and "*Loudermill* hearing" interchangeably to refer to the procedure required by *Loudermill*, and the Parties at times seem to use this nomenclature regardless of whether termination or some lesser adverse consequence was anticipated or possible following any given meeting.

October 13 describing expectations for the classroom moving forward.  Villaume Aff. Ex. K [ECF No. 25-11]; Ward Dep. at 39.  The letter was signed by Principal Ward.  Villaume Aff. Ex. K.  Ward testified that the letter was not intended as punishment for Eilen, merely as support, so that:

> the parent complaints could stop coming in and they could understand.  You know, I was really trying to help her get back into the classroom without parents coming—because if I had one form of communication stating what the expectations were happening, then parents wouldn't just keep coming saying, well, today this; today that.  I was really trying to be, actually, helpful in creating one line of communication coming from the principal really supporting Ms. Eilen and the first-graders.

Ward Dep. at 39.  Regardless of Ward's intentions, Eilen found the letter humiliating.  Eilen Dep. at 83.

## B

The next series of events relevant to Eilen's claims began not quite two months later, on December 2, 2015, when Ward emailed Eilen about a complaint that Ward had received relating to Eilen's alleged failure to comply with a student's Individualized Education Program and Behavior Intervention Plan, as well as Eilen's interactions with the student's family member during a meeting regarding those subjects.  Skelton Aff. Ex. 7 [ECF No. 22-7].  Ward and Eilen held a due-process meeting regarding these issues on December 3.  *See* Eilen Dep. 91–92.  Ward drafted a notice of deficiency before the meeting, but after the meeting Eilen received only a notice of concern.[3]  *Id.* at 95.  Eilen perceived the notice

---

[3]     The Parties do not identify the source or precise definition of the terms "notice of deficiency" and "notice of concern."  Regardless, the meaning and significance of these terms to Eilen's claims is inferable from the Parties' submissions.

of concern as disciplinary. *Id.* at 96. It is not entirely clear whether Ward also considered the notice to be a form of discipline. Ward Dep. at 41. Eilen's union considered it a non-disciplinary coaching letter that was not subject to the union's grievance procedures. Eilen Dep. at 95–96; Skelton Aff. Ex. 8 [ECF No. 22-8].

The following week, on December 9, Eilen, in her capacity as union steward, facilitated a meeting between Ward, others in the Bryn Mawr administration, and staff to discuss teachers' complaints about Ward's management of the building and her treatment of staff. Eilen Dep. at 29–30. This meeting followed a visit to Bryn Mawr a few months earlier by representatives of the national and local teachers' unions, which Eilen had helped organize. Ward Dep. at 21. Eilen later reflected in an email to staff that the union leaders' visit had made clear that Bryn Mawr staff required support. *Id.* Ward insists that she was calm throughout the December 9 meeting, *id*. at 27–28, but Eilen alleges that Ward was at times "incredibly angry at what was being brought forward," Eilen Dep. at 31. Eilen believed, in light of their past tensions, that Ward was holding her responsible for all of the concerns voiced in the meeting as though Eilen was the instigator, although in fact it was other staff members who had brought their disparate concerns to Eilen as their building steward. *Id*. Eilen never initiated a formal grievance relating to the issues discussed at the December 9 meeting and never brought those concerns to anyone at the district level. *Id.* at 32–33. She did tell other union officials that she feared retaliation for the work she was doing on behalf of union members. Villaume Aff. Ex. B ("Nordgren Dep.") at 22–23 [ECF No. 25-2].

## C

A few weeks later, on Monday, January 11, 2016, Eilen sustained a broken clavicle, a concussion, and other injuries when her car was rear-ended. Eilen Dep. at 97, 100. As a result, she did not teach January 11 through January 13. Skelton Aff. Ex. 4 at 2. She returned to work that Thursday and Friday, and also taught the first two days of the following week. *Id.* But at the end of the work day on Tuesday, January 19, Eilen notified Ward that, beginning Wednesday, January 20, she would only work half days until she could see her doctor the following Tuesday, January 26. Skelton Aff. Ex. 11 [ECF No. 22-11]. The day after her medical appointment, January 27, Eilen informed Ward and the leave coordinator for MPS that she would be taking another period of FMLA leave as she continued to recover from her car accident. Skelton Aff. Ex. 12 at 4 [ECF No. 22-12]. On February 8, MPS approved Eilen's request for FMLA leave effective January 20 through April 20. Skelton Aff. Ex. 14 [ECF No. 22-14]; Skelton Aff. Ex. 15 [ECF No. 22-15].

Eilen remained on leave through February but notified MPS's leave coordinator on March 2 that she expected to return to work that month ahead of schedule. Skelton Aff. Ex. 16 at 4 [ECF No. 22-16]. Specifically, Eilen said that she would receive a return-to-work plan from her physician the next week and did not yet know whether her doctor would permit her to work full-time immediately or would instead prefer a ramp-up period of half-day work. *Id.* Two days later, Eilen informed Ward that she was tentatively expecting to return the week of March 21. Skelton Aff. Ex. 17 at 2–3 [ECF No. 22-17]. Ward responded promptly, requesting a specific return date so that the school could communicate appropriately with the students and their families and writing: "Glad you are

feeling better and we look forward to your return." *Id.* at 2. In follow-up correspondence, Ward asked Eilen to confirm whether she would indeed return on March 21, because the timing of her return date would determine whether the long-term substitute assigned to Eilen's classroom would hold an open house for families as she had planned, or whether Ward should instead inform the families of Eilen's return date. *Id.* at 1.[4] Around the same time that Eilen and Ward were corresponding to plan Eilen's return, Eilen was corresponding with MPS's leave coordinator about whether there would be any problem with gradually returning to full-time work. Skelton Aff. Ex. 16 at 1–3. The leave coordinator informed Eilen, "[a] lot will depend on what hours and restrictions that your doctor issues for your return to work. Until I see what your doctor outlines for your return to work I am unable to give you any definitive answers." *Id.* at 1. Ultimately, Eilen's doctor approved her to work only Mondays, Wednesdays, and Fridays, beginning March 24. Skelton Aff. Ex. 18 [ECF No. 22-18]; Skelton Aff. Ex. 19 [ECF No. 22-19]. March 24, 2016, was a Thursday and the last school day before the district's week-long spring break. Skelton Aff. Ex. 20 [ECF No. 22-20].

On March 21, 2016, MPS informed Eilen:

> The intermittency of this [three-days-per-week] leave [schedule required by your doctor] has placed a significant hardship on Bryn Mawr Community School to deliver consistent education to our students. As a result, we are administratively transferring you to a Reserve on Special Assignment (ROSA) position, effective Thursday, March 24,

---

[4] Around this same time—on March 8—Ward instructed Eilen not to communicate with other Bryn Mawr staff members because she was on medical leave and her time should be spent recovering. Ward Dep. at 95–96; Villaume Aff. Ex. N. It is not entirely clear from the Parties' submissions what events might have precipitated this email from Ward.

2016. As a ROSA, you will be assigned to a building to teach
as needed within your medical restrictions and licensure.

Skelton Aff. Ex. 22 at 1 [ECF No. 22-22]. Eilen understood that if she had been cleared to

work a full-time schedule, she would have been able to return to her first-grade classroom

at Bryn Mawr, but she was still devastated by the reassignment, which she understood to

be a substitute-teacher role. Eilen Dep. at 120. Eilen's pay and benefits were unaffected

by her administrative transfer, though, and she was eligible to interview for a more

permanent assignment for the following school year. *Id.* at 120–21, 166–67; Skelton Aff.

Ex. 22 at 1. The collective bargaining agreement ("CBA") between the teachers' union

and MPS allows for administrative transfers "to meet the District's operational needs and

the best interests of students, school/program, and affected teacher(s)." Skelton Aff. Ex. 26

at 7 [ECF No. 22-26]. The CBA provides for certain procedures in the event that the union

disputes the administrative transfer, *id.*, but Eilen did not pursue those procedures because

she understood that she "didn't have much choice," Eilen Dep. at 119.

## D

Because she was leaving Bryn Mawr, Eilen needed to move her personal items out

of her first-grade classroom. *See* Skelton Aff. Ex. 22 at 1. The circumstances surrounding

Eilen's move-out are relevant to her claims. Eilen met with Steve Barrett, MPS's

Executive Director of HR Operations, and he told her "to get them out of there as soon as

[she] could." Eilen Dep. at 132–33. Eilen came to Bryn Mawr to remove her personal

belongings on Friday, March 25, the first day of spring break, with the help of several

colleagues. *Id*. at 132–34. Ward was not present. Ward Dep. at 100. Accounts differ about what happened during the move-out.

Eilen testified that when she arrived, "a lot of garbage" was on the floor, papers were stacked on a desk and the counter, materials were broken, and student work was in untidy piles—essentially that she was walking into a mess created by the substitute who had been teaching in her room. Eilen Dep. at 135–36, 138–39. As she understood she had been instructed to do, she removed or discarded many of her own materials from the classroom, including removing from the walls decorative or informational displays she had made or purchased, emptying and removing storage containers that had held student work and materials, and taking or discarding other items that belonged to her. *Id.* at 137, 139–44. She testified that where her personal belongings had stored student work, she took the student work out exactly as it had been stored and left it in a pile. *Id.* at 140–41. Eilen took down a few displays she had made but left them on the floor rather than taking them with her or placing them in a recycling bin. *Id.* at 145–47. Eilen made numerous requests for the long-term substitute to come to the room so they could discuss what the substitute wanted her to do with those materials that would be left in the room, but Ward apparently had told the substitute not to come to the classroom while Eilen was there. *Id.* at 135, 143; Villaume Aff. Ex. A ("Fisher Dep.") at 26–27 [ECF No. 25-1]. Due to her ongoing medical issues, Eilen had hired movers to remove her belongings once they were packed up, and she felt time-pressured to complete the move-out process before they were scheduled to arrive at noon. Eilen Dep. at 142.

Defendants, by contrast, contend that Eilen essentially trashed the classroom by discarding student work and usable classroom materials that should have been left for the next teacher and generally leaving the classroom in an unusable condition. *See generally* Mem. in Supp. at 9–11. Ward testified that she had observed the classroom before Eilen came to move out and that the substitute teacher had not left the classroom in a disorderly condition. Ward Dep. at 66–67.

Testimony from individuals who are not parties to this lawsuit lends support to both versions of events. For example, Bryn Mawr's senior custodian observed that, although both Eilen and her long-term substitute usually kept the classroom tidy, after Eilen removed her belongings on March 25, the room was "a mess . . . . [a] my God, look at this room type of deal." Skelton Aff. Ex. 28 ("Stresnak Dep.") at 11–12 [ECF No. 22-28]. By contrast, one of the teachers who helped Eilen move out that day understood from the substitute that Eilen's students had broken things in the room while Eilen was on leave, and that the colleague was "shocked" by the school's response to the move-out, essentially because Eilen had done the best she could under the circumstances. Fisher Dep. at 24, 26–27.

Eilen was placed on administrative leave pending an investigation of her classroom move-out. Ward Dep. at 101. After a due-process hearing was held on April 15, MPS determined that in moving out, Eilen "threw away student work, confidential information, district property and new and usable materials in the garbage, failed to address a significant water spill and did not report the condition of the classroom to the principal or the engineer [custodian]." Skelton Aff. Ex. 25 [ECF No. 22-25]. Because MPS found that Eilen had

"fail[ed] to leave [her] classroom in a condition ready for student learning upon being administratively transferred into another position outside of Bryn Mawr," it imposed a five-day suspension. *Id.* Eilen's written notice of suspension was dated June 7, 2016, and was signed by an employee-relations associate with MPS; Ward was copied on the notice. *Id.*

E

Since these events, Eilen has continued to work for MPS without interruption and without any adverse impact on her salary or benefits. After her suspension, Eilen apparently completed her ROSA placement for the remainder of the 2015–2016 school year. *See* Eilen Dep. at 125, 164–65. She went through the placement process for the following 2016–2017 school year and was placed into a full-time position as a reading specialist at a different elementary school, which she expected would be a good fit. *Id.* at 127–28. When another teacher at her new school quit, Eilen was reassigned to fill that vacated position in a second-grade classroom. *Id.* at 128–30. Initially, Eilen had hoped to retire after that school year and therefore did not seek another permanent placement for the 2017–2018 school year; she decided not to retire after all and took a full-time, long-term substitute position at a third school, and then a full-time permanent position as a first-grade teacher at a fourth school, a position she continues to hold. *Id.* at 20–22, 130–31. Again, aside from the five-day suspension, her pay and benefits have not been adversely affected by the events that occurred at Bryn Mawr during the 2015–2016 academic year. *Id.* at 127–28, 130–31, 165–67. Eilen testified that she has suffered harassment, humiliation, intimidation, stress, anxiety, depression, and physical consequences including a ruptured eye and cardiac problems as a result of these events. *Id.* at 157–58.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Tolan*, 572 U.S. at 651 (quoting *Anderson*, 477 U.S. at 255).

A

Eilen first alleges that MPS took adverse employment actions against her in response to her requests for FMLA leave. Compl. ¶ 48. Although Eilen describes this as an "FMLA retaliation" claim, *see id.* ¶¶ 44–55 (Count I), Defendants argue that it is more correctly termed an "FMLA discrimination" claim, *see* Mem. in Supp. at 14 [ECF No. 21]. The Eighth Circuit has, at various times, used either phrase to refer to a claim that arises "when an employer takes adverse action against an employee because the employee exercises rights to which [s]he is entitled under the FMLA." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006–07 (8th Cir. 2012) (describing the claim as "FMLA discrimination"); *Wierman v Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011) (describing the claim as "FMLA retaliation").

Regardless of nomenclature, for Eilen to establish a prima facie case under the FMLA, she would need to point to evidence that MPS acted based on Eilen's exercise of

her rights under the FMLA. *See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013). Such evidence may be direct or indirect. *Id.* Direct evidence of discrimination entails "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Russell v. City of Kansas City*, 414 F.3d 863, 866 (8th Cir. 2005) (citation omitted). It includes "comments or statements indicating discriminatory intent, where those comments are made by people with decision-making authority." *Hutton v. Maynard*, 812 F.3d 679, 683 (8th Cir. 2016) (citation omitted). In the context of a discrimination claim, whether evidence of discrimination is direct or indirect depends on "the causal strength of the proof, not whether it is 'circumstantial' evidence." *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014) (citation omitted).

Eilen argues that she has direct evidence of discrimination. To support this contention, she identifies only the fact that she was placed on a five-day suspension while on FMLA leave. Mem. in Opp'n at 26. But temporal proximity alone generally does not constitute direct evidence of discrimination, and discrimination claims brought by employees who suffer adverse employment actions while on leave are typically analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Eriksson v. Deer River Healthcare Ctr., Inc.*, 15 F. Supp. 3d 919, 925–26 (D. Minn. 2014). Accordingly, because Eilen has not produced evidence of discrimination beyond the temporal overlap of her FMLA leave and suspension, Eilen's FMLA claim will be analyzed under the *McDonnell Douglas*

burden-shifting framework. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007).

Under that framework, Eilen can establish a prima facie case of discrimination by showing that (1) she engaged in protected activity under the Act, (2) she suffered a materially adverse employment action, and (3) a causal connection existed between her protected activity and the adverse employment action. *Pulczinski*, 691 F.3d at 1007 (citation omitted). A plaintiff's burden in making her prima facie case is "minimal." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (citation omitted). If she can satisfy that minimal hurdle, the burden then shifts to MPS "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. If MPS meets this burden, then Eilen may be able to demonstrate that MPS's purportedly legitimate, nondiscriminatory reason was pretextual or was discriminatory in its application. *Id.* at 807. There is no question—and Defendants admit—that Eilen engaged in statutorily protected activity by requesting FMLA leave. Mem. in Supp. at 15. But her FMLA claim falters on the other two elements of a prima facie case.

1

Eilen's brief identifies what she says are six distinct adverse employment actions: (1) the September 30, 2015 due-process meeting; (2) the October 9, 2015 due-process meeting; (3) the December 3, 2015 due-process meeting and resulting notice of concern placed in Eilen's file; (4) the March 9, 2016 email "reprimand" instructing Eilen not to communicate with Bryn Mawr staff members while on leave; (5) Eilen's five-day suspension; and (6) severe emotional damages Eilen suffered as a result of Defendants'

conduct, *id.* at 24–25. Mem. in Opp'n at 16–25. Notably, Eilen does not contend that her administrative transfer constitutes an adverse employment action. *See* Reply Mem. at 2 n.1 [ECF No. 28].

Defendants concede, as they must, that the unpaid suspension constitutes an adverse employment action. Mem. in Supp. at 17. But as a matter of law, the other events Eilen cites do not. An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a collective discharge." *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (citation omitted). "[M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Id.* (citation omitted). None of the due process meetings or the emailed "reprimand" resulted in any change to Eilen's grade, pay, or benefits, and did not affect her job duties in any way, much less a disadvantageous one. *See id.* at 804–05. The notice of concern placed in her file after the December 3 due-process meeting does not constitute an adverse employment action because there is no evidence that any adverse action was taken against Eilen as a result of that letter's issuance. *See id.* at 805 (citing *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003)). Finally, although the type of emotional and physical consequences Eilen experienced in response to these events might be relevant to other aspects of a discrimination claim—namely, as evidence of damages—they do not themselves constitute adverse employment actions. *See Jones v.*

*City of St. Louis*, 825 F.3d 476, 480 (8th Cir. 2016) (affirming conclusion that emotional distress resulting from defendant's conduct and ultimately requiring the plaintiff to take medical leave did not constitute adverse employment action for purposes of racial-discrimination claim).

2

To show that a causal connection existed between her protected activity in taking FMLA leave and her five-day suspension—the only employment action Eilen identifies that is adverse as defined by Eighth Circuit case law—Eilen relies exclusively on the temporal proximity between the two events. *See* Mem. in Opp'n at 31–33. "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (citation omitted). Temporal proximity alone may suffice only if it is "very close." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted). In determining the temporal relationship between the two events, the Eighth Circuit "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (citation omitted). Without "something more," a gap of more than two months between the date the employer knew of the employee's planned use of FMLA leave and the adverse action "is too long" to show a causal connection between the two. *Id.* at 901 (citations omitted).

Here, that gap is more than four months, and there is not "something more" to establish causality. Eilen first informed MPS that she would be taking FMLA leave

following her car accident on January 27, 2016. Skelton Aff. Ex. 12 at 4. At oral argument, Eilen's counsel identified that date as the last date on which Eilen engaged in conduct protected by the FMLA, and thus the date on which the temporal-proximity clock starts for that claim. On April 11, 2016, she was placed on administrative leave pending a due-process meeting to discuss her classroom move-out. Ward Dep. at 101. The due process meeting was held on April 15, 2016, and the district issued a Notice Of Suspension to Eilen on June 7, 2016. Skelton Aff. Ex. 25. Those dates are dispositive of Eilen's claim. An employee's placement on paid administrative leave pending an investigation does not constitute an adverse employment action. *Pulczinski*, 691 F.3d at 1008 (citation omitted). As described above, neither does a due-process meeting. Therefore, the operative dates for assessing Eilen's FMLA claim for temporal proximity are a start date of January 27 and an end date of June 7. That span of more than four months between the protected activity and the adverse employment action, with no other evidence of a causal connection between the two, is simply too long to support a prima facie case. *Sisk*, 669 F.3d at 901 ("[m]ore than two months is too long . . . without something more."). MPS is entitled to summary judgment on Eilen's FMLA claim.

B

Minnesota's Whistleblower Act prohibits an employer from terminating an employee in retaliation for reporting a violation of the law. Minn. Stat. § 181.932, subd. 1(1). Absent any direct evidence of retaliation, courts apply the *McDonnell Douglas* burden-shifting framework to analyze retaliation claims under the Whistleblower Act. *Hilt v. St. Jude Med. S.C., Inc.*, 687 F.3d 375, 378 (8th Cir. 2012) (citing *Cokley v. City of*

*Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001)). Thus, to make out a prima facie case for retaliation, Eilen must demonstrate first that she engaged in conduct protected by the Whistleblower Act. *See id.*

No reasonable jury could find that Eilen reported any violation of the law. Eilen identifies several laws she now believes MPS violated—the FMLA; Minn. Stat. § 179A.06, subd. 2, which protects public employees' rights to unionize; and the First Amendment, Mem. in Opp'n at 38–39, 44–48—but she cites no evidence showing that she reported any of these asserted violations to MPS prior to her suspension. The only factual circumstances Eilen cites pre-dating her suspension relate to the December 9 meeting she facilitated between Ward and Bryn Mawr teachers in her capacity as the building's union steward. *Id.* at 38–39. That meeting, by Eilen's own account, related to concerns with Ward's management and treatment of staff. Eilen Dep. at 29–30. Eilen points to no evidence that the discussions at that meeting even remotely touched on actual, suspected, or planned violations of the law. *See* Minn. Stat. § 181.932, subd. 1(1). Indeed, Eilen testified that she did not report any violation of state or federal law to anyone within MPS. Eilen Dep. at 156–57 ("Q: Did you make any reports to [MPS] about any violation of state or federal law? [. . .] A: I don't think I did."). MPS therefore is entitled to summary judgment on Eilen's Whistleblower Act claim.

## C

Eilen brings her § 1983 claims against Ward in both her official and individual capacities, as well as against MPS. *See* Compl. ¶¶ 67–76 (Count III). She alleges that her

state and federal constitutional rights to freedom of association were violated, as were her state and federal rights to be free from a hostile work environment. *Id.* ¶ 67.

"It is well settled . . . that 42 U.S.C. § 1983 may be an avenue for relief only when a plaintiff asserts that violations of *federal* rights have occurred." *Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000) (citations omitted). Furthermore, "there is no private cause of action for violations of the Minnesota Constitution." *Guite v. Wright*, 976 F. Supp. 866, 871 (D. Minn. 1997); *see also Mlnarik v. City of Minnetrista*, No. A09-910, 2010 WL 346402, at *1 (Minn. Ct. App. Feb. 2, 2010) (unpublished) (explaining that "[n]o private cause of action for a violation of the Minnesota constitution has yet been recognized" and that a constitutional claim alleged thereunder was not cognizable (alteration in original)). Therefore, to the extent Eilen's § 1983 claims are premised on violations of the Minnesota Constitution, or to the extent Eilen intends to assert claims directly under the Minnesota Constitution, those claims must be dismissed.

Furthermore, because MPS is a governmental entity, Eilen could maintain a § 1983 claim against it only if she could show that it adopted some policy, custom, or practice and that the policy, custom, or practice was the moving force behind a violation of Johnson's rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "An alleged illegal custom must be widespread and may only subject a school district to liability if it is pervasive enough to have the 'force of law.'" *Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181–82 (8th Cir. 1998) (quoting *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998)). A single occurrence is generally not sufficient to show a policy, custom, or practice for purposes of *Monell* liability. *Ulrich*

*v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013) (citation omitted). Eilen identifies no district policy, custom, or practice at all, much less one related to the constitutional violations she alleges she suffered, and at oral argument her counsel conceded that he was not aware of any MPS policy that might be relevant to her § 1983 claim. MPS is entitled to summary judgment on Eilen's § 1983 claim. Neither can Eilen maintain a § 1983 claim against Ward in her official capacity because suits against government officials in their official capacities are "functionally equivalent to a suit against the employing governmental entity" and are "properly dismissed . . . as redundant" of Eilen's failed §1983 claim against MPS. *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citations omitted).

As to Eilen's § 1983 claim that Ward in her individual capacity, violated Eilen's federal right to be free from a hostile work environment that was almost certain to cause her harm, the Eighth Circuit has recognized the availability of a hostile-work-environment claim arising under § 1983 and based on racial and sexual harassment, *see generally Ellis v. Houston*, 742 F.3d 307 (8th Cir. 2014) (racial hostile-work-environment claim under § 1983); *Williams v. Herron*, 687 F.3d 971 (8th Cir. 2012) (hostile-work-environment claim under § 1983 based on pervasive sexual harassment), and Eilen cites several cases involving a hostile-work-environment claim based on such harassment, *see* Mem. in Opp'n at 40–41. However, Eilen does not attempt to allege she was subjected to a hostile work environment on the basis of either her race or her sex. Rather, she seems to suggest that Ward's workplace bullying was so obviously and inevitably going to cause Eilen harm that it constituted some sort of violation of Eilen's rights. *Id.* at 40. Eilen does not explain how

such a right might arise under the U.S. Constitution or what specific actions Ward might have taken that violated that right.

For legal authority, Eilen points to *Eddy v. Virgin Islands Water & Power Authority*, in which the District of the Virgin Islands found that the plaintiff's supervisor at a public-utility corporation violated the plaintiff's substantive due process rights when it assigned him—despite a lack of training or experience as an electrician and a lack of safety equipment—to change a live high-voltage switch carrying 14,000 volts of current, ultimately causing him to be electrocuted and to suffer serious physical injury. 955 F. Supp. 468, 471–72 (D.V.I. 1997), *rev'd on other grounds*, 961 F. Supp. 113 (D.V.I. 1997). Whatever theory Eilen might mean to allege about her hostile-work-environment claim, her situation has nothing in common with the conduct described in *Eddy*. And in permitting the § 1983 claim to proceed in *Eddy*, the court seemed to acknowledge that it was already at the outer edge of Supreme Court's Fourteenth Amendment jurisprudence: As a general matter, the court recognized, "[n]either the text nor the history of the Due Process Clause supports [a] claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Id.* at 474 (first alteration in original) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)). Under the facts of this case and given the lack of relevant authority or argument advanced by Eilen, it would be unwise "to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125 (citation omitted).

The contours of whatever remaining § 1983 claims Eilen might mean to allege against Ward in her individual capacity are difficult to discern. In her Complaint, Eilen alleges that she is a member of a protected class, that she possesses a First Amendment right to free association, that she has a right to be free from a work environment that was hostile and almost certain to cause her injury, that she was discriminated against for participating in union activity, and that she was discriminated against for exercising her statutory rights under the FMLA. Compl. ¶¶ 67–68. As far as the specific actions Eilen identifies as violating one or more of those rights, she arguably identifies three: transferring her to another school to thwart her union activities; subjecting her to disparate treatment by expecting her to perform job duties, and disciplining her for falling behind in her work, while she was on medical leave; and retaliating against her in some unidentified way for engaging in union activities and applying for medical leave. *Id.* ¶¶ 70–72, 75.

To prevail on a § 1983 claim against Ward, Eilen must show that Ward personally violated her constitutional rights. *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (citation omitted). Insofar as her § 1983 claim is based on actions undertaken by people other than Ward—for example, the decision to transfer her to another school, *see* Skelton Aff. Ex. 22, or the decision to suspend her, *see* Skelton Aff. Ex. 25—Ward ordinarily could not be held liable for those decisions. And Eilen has produced no facts from which a reasonable fact finder could conclude that those third-party decisionmakers acted merely as a "cat's paw" by which Ward achieved some unlawful purpose. Mem. in Opp'n at 45–46; *see also Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006) (discussing the Eighth Circuit's "cat's paw rule" (citations omitted)). The only fact Eilen cites in support

of her cat's-paw theory is that Ward inappropriately reported Eilen on trumped-up allegations that she left her classroom in an unusable condition when she moved out.  *See* Mem. in Opp'n at 45–46.  As an initial matter, that argument could apply, if at all, only to her suspension, and not to her administrative transfer, which she does not argue was instigated by Ward.  Furthermore, she cites no authority for the proposition that initiating such a report, standing alone, could support a viable claim.  To the contrary, in *Kramer v. Logan County School District No. R-1*, the Eighth Circuit found that the plaintiff had adduced sufficient evidence of a cat's-paw theory to support the jury verdict in her favor where the jury could have concluded not only that the defendants initiated the contract review that led to the non-renewal of her position but also that they had a track record of discriminatory conduct toward plaintiff and other women and had "made material misrepresentations and omissions in presenting their recommendation [of not renewing the plaintiff's contract] to the board."  157 F.3d 620, 624 (8th Cir. 1998).  Eilen has presented no evidence of past discriminatory conduct by Ward or how Ward might have been involved in the ultimate decision-making process.  "Where a decisionmaker makes an independent determination as to whether an employee should be terminated and does not serve as a mere conduit for another's discriminatory motives, the 'cat's paw' theory fails." *Richardson*, 448 F.3d at 1060 (citation omitted).

Insofar as Eilen's § 1983 claim against Ward is based on Ward's handling of her periods of FMLA leave, that claim must be brought under the FMLA, and cannot be converted into a constitutional claim to be litigated under § 1983.  *See, e.g.*, *Lucht v. Encompass Corp.*, 491 F. Supp. 2d 856, 866 (S.D. Iowa 2007) (concluding that the

"remedies provided by [29 U.S.C. § 2617] are the exclusive remedies for FMLA violations" and that claims amounting to FMLA discrimination may not be brought as state-law wrongful-discharge claims).

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' summary-judgment motion [ECF No. 19] is **GRANTED**. Plaintiff's Complaint [ECF No. 1-1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  April 10, 2019                          s/ Eric C. Tostrud
                                                Eric C. Tostrud
                                                United States District Court